ARLEN B. LOONEY and DOREEN M. LOONEY; RONALD K. MULLIN and KATHLEEN MULLIN; and R. MAX ETTER, JR. and SUSAN K. ETTER, Petitioners v. COMMISSIONER of INTERNAL REVENUE, Respondent
Looney v. Commissioner
Docket Nos. 20963-83, 35210-83, 35211-83.
United States Tax Court
T.C. Memo 1985-326; 1985 Tax Ct. Memo LEXIS 309; 50 T.C.M. (CCH) 327; T.C.M. (RIA) 85326; July 2, 1985. Robert E. Kovacevich, for the petitioners. Robert F. Geraghty, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes: Petitioners
Docket No.
Year
Deficiency
Arlen B. Looney, et ux.
20963-83
1977
$33,149.76
1978
109,519.33
1979
113,005.42
1980
64,691.29
Donald K. Mullin, et ux.
35210-83
1980
17,366.00
1981
5,054.00
R. Max Etter, Jr., et ux.
35211-83
1980
17,263.85
1981
4,457.37
The deficiencies are attributable to a number of adjustments, most of which have been resolved by the parties. The only issue remaining for decision is the deductibility of "advance minimum rentals" and production and recording costs paid in 1980 and 1981 with respect to two master sound recordings leased *311 by petitioners and certain other individuals. FINDINGS OF FACT Petitioners were legal residents of Spokane, Washington, when they filed their respective petitions. Petitioners' income tax returns for the years in dispute were filed with the Internal Revenue Service office in Ogden, Utah. In late 1980, Robert Kovacevich (Kovacevich), an attorney who specializes in the practice of tax law, assisted petitioners Arlen B. Looney (Looney), Donald K. Mullin (Mullin), and R. Max Etter (Etter), [1] along with other individuals, in arranging for a lease of two master sound recordings from Music Leasing Company (MLC). MLC was headquartered in New York and was engaged in marketing musical recordings as tax shelters. MLC was organized in August 1980, with no prior operating history; its officers had no expertise or prior experience in the music recording industry. Its local representative in Spokane was Dan Miller (Miller), who supplied Kovacevich with a number of documents: (1) Music Leasing Company Master Recording Program Information Memorandum (PIM), which explained the program in detail; (2) a 31-page tax opinion bearing the name of a New York law firm; and (3) a list of master recordings *312 MLC had available for lease. The material supplied to Kovacevich described a master recording (master) as a "reproduction on tape of a recorded program", never before sold "in their present form or configuration"; the material represented that a master "will be leased in such manner to enable Lessees to engage in the manufacture and distribution of Products throughout the world", i.e., the manufacture of such products as "long playing albums or singles, and tape cartridges or cassettes * * *." The materials represented that tax write-offs would be available to prospective investors equivalent to at least $5.30 in deductions for each $1.00 invested, assuming the purchaser was in a 50 percent tax bracket. The allegedly available write-offs were in the form of an investment tax credit passed through from the company equal to 10 percent of the value MLC assigned *313 to the master and ordinary income ductions equal to the investor's cash payments which were designated as rental deductions. Kovacevich and a group of individuals decided to acquire some masters. On or about December 2, 1980, a checking account was opened in the Farmers and Merchants Bank under the name Circle K Records, Robert E. Kovacevich or A.V. Klaue. Kovacevich had signatory authority over the account. Petititioners wrote the following checks which were deposited in the account: Petitioner
Payee
Date
Amount
Looney
Circle K Records
11-30-80
$5,550
Looney
Circle K Records
12-12-80
5,550
Mullin
Kovacevich
12-15-80
8,497
Etter
Kovacevich
12-15-80
8,497
Other individuals also made deposits in the account. Under date of December 5, 1980, Kovacevich sent a handwritten letter to Stan Pearson, President of MLC, offering to "purchase" two long-playing records by an artist, Tom T. Hall, [2] and enclosing a check in the amount of $26,260 drawn on the Circle K Records account. The letter contained the following: This money is a deposit to the purchase and subject to the following conditions: 1. The check is from a nominee account of Circle *314 K Records, which is a tenancy in common account. The actual purchasers are: 20 %
August V. Klaue
SS 539-07-4205
10 %
Arlen Looney, Sr.
537-01-8570
7.5%
Ronald Mullin
7.5%
Max Etter, Jr.
7.5%
Carl C. Morrison
7.5%
Russell Van Camp
7.5%
Michael Hagan
12.5%
Robert E. Kovacevich
531-32-7726
2. These persons are purchasing as tenants in common pursuant to the Common Law and the Revised Code of Washington (RCW 64.28.030) and are excepted from partnership treatment under RCW 25.04.070(2)(3). Under date of December 9, 1980, Kovacevich sent a letter to the other investors in the group with respect to the masters. In the letter, he stated that the members did not yet have binding agreements with MLC and that Miller would *315 be calling on the members to complete details. Attached to the letter was a schedule showing the amount of money each member had paid or would have to pay by December 15, 1980, for the masters and the production costs. The amounts to be paid by that date totalled $108,296 which was allocated among the members according to their respective percentage interests. Looney's share, for example, was shown as $10,080 for the "record" and $937 for "production costs and recording." At some point, apparently in early December, 1980, Looney, Mullin and Etter each executed two separate lease agreements on forms supplied by MLC, all of which are dated December 5, 1980. The term of each lease was 85 months and payment for the first 12 months was to be made in the form of a minimum rental due on execution of the lease. Minimum rental payments for months 13 through 15 were due at the end of the eighth month. Rent for months 16 through 85 was to be paid at the end of each such month and was payable only out of, and was to consist of, 75 percent of the net receipts by the lessees from exploitation of the masters. The total cost of each master was shown as $1,100,000. The agreements did not name *316 the masters being leased, but all except one of them designated the artist as Tom T. Hall or Tom T. Hall II. [3] The leases contained warranties of good title and industry quality. The agreements reflected the following rental payments for the first 12 months: Initial
Petitioner
Agreement
Percentage
Payment
Looney
1
10  $5,040
Looney
2
10  5,040
Mullin
1
7.5
3,750
Mullin
2
7.5
3,750
Etter
1
7.5
3,750
Etter
2
7.5
3,750
In connection with the leases, petitioners each signed, among other papers, a Lessee Warranty Statement. By signing the statement, the investor warranted that he had received the PIM and had employed a legal advisor and tax advisor to assist him in evaluating the purchase. He also acknowledged that the fair market value MLC had assigned to the master was based on certain assumptions which may prove to be incorrect, that he had independently evaluated the merits of acquiring a lease and was not relying on the information in the PIM. By so signing, the investor also *317 acknowledged that he was aware of and understood that MLC had no prior operating history, and that the acquisition of a MLC lease is a speculative acquisition involving a high degree of risk of loss by the investor. Tom T. Hall, the artist whose master recordings are referred to in the lease agreements, is a well known country and western singer and songwriter. He has been recording since the 1960's. From 1972 through 1980, he was under exclusive recording contracts with major recording companies. Before petitioners executed the MLC leases, neither MLC, petitioners, nor any other prospective lessees of the masters, contacted Tom T. Hall, his representatives or the recording companies who had Tom T. Hall under exclusive contract, to determine whether MLC had the right to lease the masters. On December 19, 1980, Kovacevich sent a letter to the law firm, Rosenbaum, Lerman, Katz & Weiss, which he had retained to handle the closing of the transaction. In this letter, Kovacevich explained that Russell Van Camp and Michael Hagan, who had been listed in his letter of December 9, 1980, as participants in the venture, were not purchasing interests and that three additional purchasers, *318 Patricia J. Maldon, Wayne W. Ormiston, and A. Keith Uddenberg, each with a 5 percent interest, had been added to the group. With the letter, Kovacevich enclosed the following checks dated December 18, 1980, all drawn by himself on the Circle K Records account: Payee
Amount
Rosenbaum, Lerman, Katz
Trust Account
$74,540
Album Globe
4,700
Super Productions
2,000
Petitioners did not listen to the two masters which they had leased until the spring of 1981. When they did, they learned that the so-called masters were of very poor quality. Each master has two programs. [4] Program I of the first master begins with the tune, "I Like Beer", but the recording starts in the middle of the song, with no introduction or identification of the artist. Another song, "The Ballad of Forty Dollars", abruptly ends before it is actually over. In the words of an expert, there "are serious microphone problems, terrible feed-back noises, and volume drifts, poor mixing of sound, excessive crowd noises and just about every other engineering imperfection * * *." *319 The second master [5] is of equally poor quality. On the first selection, an announcer introduces Tom T. Hall, but the recording actually begins in the middle of the introduction. In the words of an expert: The entire first side of the recording contains numerous imperfections that would not be acceptable in a commercial recording. There are microphone problems, feedback noise, tape speed variance, and a variety of other unprofessional problems that occur. On the second side of the recording the problems are duplicated. * * * Everything about the recording is wrong and based on my professional experience it would not be possible to correct the problems that exist on the tape. * * * The two master recordings have no commercial value. The master recordings were taken from a soundtrack of a video tape made sometime between 1977 and 1980 by an individual who was permitted to video tape a Tom T. Hall Concert. Hall's *320 attorney told that individual, however, that he could not sell cassettes, phonograph records, or any derivatives of the taping. The individual never obtained approval to release or use the tape for any commercial purpose. The marketing of the recordings without the permission of Mercury Records would have violated Hall's exclusive contract with Mercury. Neither Hall, Mercury Records nor anyone else with authority ever authorized the sale of the masters involved in these cases or products manufactured from them. The masters purchased by petitioners and the other related investors were thus pirated recordings. MLC did not have title to the recordings and had no authority to grant petitioners leases covering the recordings. In early 1982, Hall's attorney received information that Kovacevich was involved in attempting to market the two masters. On January 11, 1982, he telephoned Kovacevich and followed up that contact with a letter in which he stated: I hope that by the time you receive this letter I have been able to reach Mr.f Pearson [of MLC] to advise him that the master he has been selling and attempting to sell is a pirated master. Tom T. Hall has not granted anyone *321 the right to sell such product and does not want it on the market. After learning that the masters were pirated, Etter and Kovacevich discussed whether they should exercise their option under the Lease Agreements to substitute masters from MLC's inventory. Petitioners did not exercise the option. The only investments petitioners made in the transaction with MLC were their initial cash payments which were deposited in the Circle K Records checking account. Petitioners did not make the second payment of minimum rentals for months 13 through 15 which were due on August 5, 1980, under the terms of the leases. Only the four checks described above were ever drawn on the Circle K Records account, all by Kovacevich in December 1980. There have been no sales of recordings manufactured from the subject Tom T. Hall masters. The only "revenue" from the masters was reported on Album Globe Distribution Company, Inc. royalty statements which, as of June 30, 1981, showed a total of $2,000 payable to Circle K Records as "advance unearned foreign royalties." [6]
*322 On November 29, 1983, petitioners, together with other members of the Circle K Records group sued MLC and other defendants alleging breach of contract, fraud, negligent misrepresentation, violation of Consumer Protection Act, punitive damages and violation of Washington State Securities Act. The action was brought in the Superior Court of the State of Washington, County of Spokane and captioned Circle K Records, a joint venture v. Music Leasing Company, a division of IFC Leasing Company, a New York Corporation, et al., No. 84201971-3. The complaint alleged, in part, as follows: During the latter part of 1980, the Plaintiff, by and through its members, entered into an agreement with Music Leasing Company during December, 1980. In exchange for a sum of money, Plaintiff's members were leased what was believed to be master recording[s] of singer Tom T. Hall. It was later revealed, however, that Music Leasing Company did not own the rights to Tom T. Hall's performance, but had in fact leased to Plaintiff's members a worthless pirated copy of Tom T. Hall's work. Judgment was entered for the plaintiff by default on December 31, 1984. On Schedule C of their income tax returns *323 for 1980 and 1981, petitioners claimed deductions and investment tax credits which were disallowed in the notices of deficiency as follows: Investment
Petitioners
Year
Tax Credit
Loss
Looney
1980
$11,000
$11,100
Mullin
1980
16,500
1,777
Mullin
1981
11,536
Etter
1980
16,500
1,777
Etter
1981
11,536
Petitioners have conceded the claimed investment tax credits. Only deductions for advance minimum rentals and production and recording costs remain in dispute. OPINION To support the claimed deductions for the minimum monthly rentals and production and recording costs that they paid, petitioners rely upon sections 162(a)(3) [7] and 212(1). [8] Section 162(a)(3) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year "in carrying on a trade or business" including "rentals or other payments" for the continued possession of property "for purposes of the trade or business." Section 212(1) allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year "for the production or collection of income." *324 Essential to petitioners' showing that their expenditures with respect to the Tom T. Hall master recordings are deductible under section 162(a) is a demonstration of an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); Estate of Baron v. Commissioner,83 T.C. 542, 553 (1984). While a reasonable expectation of profit is not required, petitioners' objective of making a profit must be bona fide and must be predominant. Elliott v. Commissioner,84 T.C. 227, 236 (1985). Similarly, under section 212(1), the expenditures must "satisfy the same requirements that apply to a trade or business expense under section 162 except that the person claiming the deduction need not be in the trade or business." Fischer v. United States,490 F.2d 218, 222 (7th Cir. 1973). Section 212(1) thus requires a showing that the good faith purpose of the expenditures was the profitable production of income. Snyder v. United States,674 F.2d 1359, 1364 (10th Cir. 1982); see sec. 1.212-1(a), Income Tax *325 Regs.
The issue as to whether petitioners made the expenditures for the lease of the Tom T. Hall master recordings with the predominant objective or purpose of making a profit is one of fact to be resolved on the basis of all the evidence. Siegel v. Commissioner,78 T.C. 659, 696-698 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). In deciding the issue, greater weight is to be given to the objective facts than to a mere declaration of a taxpayer's intent. Some of the relevant factors to be considered under both section 162(a) and section 212(1) are set forth in section 1.183-2(b), Income Tax Regs.[9]
*326 Based on all the evidence, we find that petitioners did not pay or incur the master recording expenditures with an actual predominant objective of making a profit. Two of the petitioners, Etter and Mullin, are attorneys and has substantial incomes in 1980. Petitioner Looney is a corporate executive and a successful businessman and had even larger income in that year. The master recordings deal was put together by Kovacevich, a tax lawyer with years of experience, near the end of the taxable year 1980. The clear inference from these and other facts of record is that the primary objective of the deal was to shelter petitioners' large incomes from tax rather than to make a profit. On December 5, 1980, Kovacevich sent to MLC his handwritten letter making an offer to purchase a Tom T. Hall recording and transmitting a $26,260 check as a deposit. In a later communication dated December 9, 1980, addressed to MLC's law firm, Kovacevich described his earlier letter to MLC as "rather hastily prepared." The haste in the handling of this nominally $2,200,000 transaction, which involved a cash investment of over $100,000, we infer, was to lay a foundation for each investor to claim for *327 1980 the major portion of the equivalent of $5.64 in tax benefits for each $1.00 of invested cash in accordance with the representations in the materials supplied to Kovacevich by Miller, MLC's local representative. [10]
Kovacevich's letters of December 5 and 9, 1980, as well as other documents in evidence, show that the investors purported to make their investments as tenants in common rather than as partners. [11] This purported arrangement may have avoided some potential *328 liabilities and disclosure objections, but it meant that, as a practical matter, unanimous agreement was required if anything was to be done with the leased master recordings. Yet Mullin and Etter, both experienced lawyers, entered into this deal with six other individuals, some of whom they did not even know. Before making this substantial investment, petitioners made no investigation or inquiries as to the character or reliability of MLC or the individuals controlling it. MLC's literature, larded with discussions of tax benefits and caveats emphasizing the risks involved, stated that MLC had been organized in August 1980, only about four months before petitioners made the December 5, 1980 deposit. The literature shows that its officers had no substantial prior experience in producing or marketing *329 musical recordings. MLC was obviously majoring in marketing tax shelters. Petitioners likewise had no substantial prior experience in marketing musical recordings. Petitioners did not even listen to the master recordings before they leased them; nor did they know what songs the recordings contained. Failure to make such elementary inquiries and to obtain expert advice in a transaction of the magnitude of this one is not consistent with ordinary sound business practice; it is evidence that petitioners lacked a profit motive. Flowers v.Commissioner,80 T.C. 914, 938 (1983); Surloff v. Commissioner,81 T.C. 210, 237 (1983). Nothing in the record indicates that petitioners obtained an appraisal of the fair market value of the master recordings before they committed themselves to the deal. As stated in our findings, the master recordings were, in fact, pirated and had no commercial value. MLC and no right to lease them. It is almost inconceivable that petitioners, experienced lawyers and able businessmen, would have entered a $2,200,000 business transaction in this manner if they were motivated by profits wholly apart from tax benefits--without *330 hearing the recording, without knowledge as to the reliability of MLC and its officers, without checking MLC's title to the property that it purported to lease, and without any concrete plans for producing and marketing recordings and tapes. Taking into account the emphasis on tax benefits in MLC's literature, the only plausible explanation for petitioners' participation in the venture was the prospect of obtaining tax benefits far in excess of petitioners' cash commitments. Petitioners point out that the lease agreements contained warranties as to title and quality and that, when petitioners learned that those warranties had been breached, they brought suit and obtained a default judgment against MLC and its president. From these facts petitioners ask us to find that they have proceeded in a business-like manner. We do not think these facts are sufficient to carry petitioners' burden of proof. We do not intend to suggest that petitioners thought they were leasing worthless pirated recordings, and we do not here decide whether they are entitled to a section 165(c)(3) loss deduction at some point. As to the years before the Court, however, we are not convinced, notwithstanding *331 the judgment against MLC, that petitioners entered into the MLC transaction with an actual and honest objective of making a profit. They are not, therefore, entitled to deductions for the claimed advance minimum rentals and production and recording costs. Decision will be entered for the respondent in Docket Nos. 35210-83 and 35211-83.
Decision will be entered under Rule 155 in Docket No. 20963-83.
Footnotes
1. Petitioners Doreen M. Looney (docket No. 20963-83), Kathleen Mullin (docket No. 35210-83), and Susan K. Etter (docket No. 35211-83) are involved in this case only because they filed joint returns with their husbands reporting their respective shares of the community income under the laws of the State of Washington.↩
2. The material supplied to Kovacevich by Miller Contained the following illustration of the tax benefits from investments in a Tom T. Hall master: FAIR MARKET VALUE $650,000 ↩
Lease
Investment
Rental
Equivalent
Price
Tax Credit
Deduction
Write Off
Multiple
1980
$28,000
$65,000
$28,000
$158,000
5.64
1981
6,000
6,000
6,000
$34,000
$164,000
3. This reference to Tom T. Hall II was evidently intended to describe the second of the two Tom T. Hall masters covered by the leases.↩
4. Program I of the first master includes "I Like Beer", "Clayton Delaney", "Faster Horses, Younger Women", "Ballad of Forty Dollars", and "Auctioneer". Program II consists of "Your Man Love You", "Sneaky Snake", "That Song is Driving Me Crazy", "John Henry", and "Mabel, You Have Been a Friend to Me".↩
5. Program I of the second master consists of "All in the Game", "Paradise", "Fox on the Run", and "I Love You Too". Program II includes "Old Dogs", "Children and Watermelon Wine", "Rank Stranger", "Rollin' in My Sweet Baby's Arms", and "Me and Jesus".↩
6. Respondent suggests that this $2,000 was "a return of the $2,000 closing payment" transmitted to MLC's law firm with Kovacevich's letter of December 19, 1980. The evidence is not sufficient to permit a finding as to the character of this $2,000 payment.↩
7. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) IN GENERAL.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- * * * (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. ↩
8. SEC.212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income;↩
9. Sec. 1.183-2(b), Income Tax Regs.↩, lists the following factors to be considered: (1) whether the taxpayer carried on the activity in a business-like manner; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in other similar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.
10. The ratio of $5.64 to $1.00 was computed, as indicated in our findings, by assuming a price of $650,000 for each recording. As finally executed, the price was fixed at $1,100,000 each and the rates of tax benefits to cash outlay would be even greater. Even the ratio of $5.64 in tax benefits to $1.00 of cash outlay meant that petitioners, who were in high tax brackets, would profit substantially from the reduction of their tax liabilities even if, as it turned out, they realized nothing from the exploitation of such rights as they expected to acquire from MLC. See Barnard v. Commissioner,731 F.2d 230, 231 (4th Cir. 1984), affg. Fox v. Commissioner,80 T.C. 972↩ (1983).
11. In the complaint filed in the suit against MLC in the Superior Court for Spokane County, Washington, Circle K Records, the name used for the bank account from which payments were made to MLC, is described as a "joint venture." The term "partnership" as used in the Internal Revenue Code includes a "joint venture." Sec. 7701(a)(2). The record does not explain this discrepancy.↩