MELVIN McCAIN and DOROTHY G. McCAIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McCain v. Commissioner
Docket No. 31542-84.
United States Tax Court
T.C. Memo 1987-285; 1987 Tax Ct. Memo LEXIS 285; 53 T.C.M. (CCH) 1030; T.C.M. (RIA) 87285; June 9, 1987. Laura Lee, for the petitioners. Henry Thomas Schafer, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Taxable
Additions to Tax
Year
Deficiency
Section 6659 [1]
1978
$20,176 $6,053
1979
40,587
12,176
1980
11,735
3,386
1981
89,309
26,793
1982
35,350
10,605
The issues for decision are (1) whether petitioners are entitled to deductions and credits with respect to their investment in a *289 master sound recording; (2) whether petitioners are entitled to a theft loss deduction for payments made with respect to their master sound recording; (3) whether petitioners are liable for additions to tax under section 6659 because of an underpayment of tax attributable to valuation overstatements with respect to their master sound recording; (4) whether petitioners are liable for the increased rate of interest provided in section 6621(c) because the underpayments are attributable to tax motivated transactions; [2] and (5) whether petitioners are entitled to a bad debt deduction in the amount of $5,000. FINDINGS OF FACT Petitioners Melvin McCain and Dorothy G. McCain, husband and wife, resided in Seattle, Washington, at the time they filed their petition in this case. Petitioners timely filed Federal income tax returns for the taxable years 1978 through 1982 with the Internal Revenue Service Center at Ogden, Utah. Since 1972 Melvin McCain *290 [3] has worked as a successful commodity futures broker. Sometime prior to October 26, 1981, petitioner became interested in acquiring master sound recordings. To this end petitioner met with Clifford Johnston (Johnston), who, along with Percy E. "Ted" Goodwin (Goodwin), designed a program of master sound recording investments. The master recordings were offered through Jerden Industries, Inc. (Jerden); Johnston and Goodwin acted as exclusive salesmen for Jerden. Following the meeting with Johnston, petitioner met with Vincent A. Gervais (Gervais), a certified public accountant, and gave him Jerden promotional materials to review. Gervais represented petitioner in tax matters and prepared petitioners' Federal income tax returns since 1979. Subsequently, petitioner and Gervais met with Johnston to discuss further the proposed master sound recording investment. Petitioner received various promotional materials from Johnston. The master recordings offered by Jerden sold for only four prices: $351,000, $452,000, $533,000, and $702,000. The purchase price would be paid with a small down payment *291 payable in cash or in cash and a short-term recourse promissory note. The balance of the purchase price would be payable by a long-term recourse promissory note with installments payable from sales of records. The promotional materials represented that an advance loan commitment would be made available by a bank to refinance the long-term recourse note at its maturity. The promotional materials emphasized the tax benefits of purchasing a master recording rather than the economic benefits that could be expected. For example: In the case of a $702,000 Master, the Tax Dollar Envelope is $467,053 for a maximum 10 year cash payment by purchaser * * * of $123,706. This results in over $343,000 in non-recapturable tax free cash to the purchaser after the purchaser has recouped all his costs. The promotional materials also gave examples and projections demonstrating the large ratio of the tax benefits available to the cost of a master recording. The promotional materials included no projections of sales or income to be derived from a master recording, but included a 25 page tax opinion by Joseph Wetzel, a Portland, Oregon, attorney. Sometime during the discussions leading to *292 his purchase of a master recording, petitioner reviewed the following cash flow projection from the sale of one million copies made from an unspecified master recording: Example
RECORD COMPANY CASH FLOW
THE RECORD COMPANY
Gross Income 1 million albums sold at
$4.44 wholesale and listed at $7.98
retail
$4,440,000 Expense Production of master tape,
$100,000 - but no net expense to
the company because this money is
charged back to the artist against
his royalties
Artist's royalties 12% of retail
sales = $957,600 less $100,000
charged back against production
costs
$857,000
Mechanical royalties to publishers: $ .0275 per song X 10 songs X 1
million albums sold
275,000
Manufacturing, packaging, shipping
1 million albums at 50 500,000
Promotion, tour support
200,000
Royalties to two AFM special funds
approx. $012 X 1 million albums
12,000
Administrative overhead: 15% of gross
income
666,000
[4] (2,510,600)
Profit (income less expense) before
taxes
$1,929,400 THE ROYALTY ARTIST
Gross Income Royalties from record company
of 12% of retail sales
$ 957,600 Expense Album production costs
$100,000
Royalty to record producer: 3% of artist's net share
25,728
20% of income to personal manager
171,520
10% of income to agent (if included)
85,760
(383,008)
Profit (income less expense) before
taxes
$ 574,592 *293 Upon deciding to invest in a master recording offered by Jerden, petitioner met with Johnston and Gerald B. Dennon (Dennon), owner and president of Jerden, to consummate the purchase. At this time petitioner listened to a recording allegedly made from the master recording he was purchasing, which included material by recording artists B. J. Thomas and Ray Stevens. The quality of the recording petitioner previewed was poor, but Dennon assured petitioner that the sound quality of the actual master was quite good. Petitioner had no experience or expertise in the music or record business. Petitioner selected this master for purchase based upon his general familiarity and appreciation of these artists and upon the recommendation of Dennon that the coupling of material from both artists would increase the value of the master recording. Dennon enjoyed success as a record producer and promoter in the 1960's. He received a Gold Record for his efforts with regard to a version of "Louie, Louie" *294 recorded by the Kingsmen that held the number two position on Billboard Magazine's "Hot 100" singles chart for six weeks in 1962. Dennon left the record business sometime thereafter. Later Dennon returned to the record business through two entities, Jerden and First American Records, Inc. (First American), with the idea of obtaining capital through the sale of master recordings to investors. Dennon was quoted in a newspaper interview as follows: "Frankly, I was appalled when I heard that people would make tapes, then put them in the closet, * * *. But then I thought, 'Why not use this as a way to capitalize a legitimate record company?'" Petitioner consulted Gervais concerning solely the tax benefits to be derived from the purchase of a master recording. Gervais had no experience in or knowledge of the music or record industry. Petitioner did not seek an independent appraisal of the master recording that he contemplated purchasing nor did he seek the advice of any one with experience in the music or record industry as to the merits of purchasing a master recording. Nonetheless, on October 26, 1981, petitioner agreed to purchase the master recording from Jerden for a total price *295 of $702,000. There was no negotiation as to terms or purchase price. Petitioner agreed to pay the $702,000 purchase price by a $16,000 cash down payment, a $16,000 recourse note payable October 30, 1982, and a $670,000 note bearing interest at 9 percent compounded semi-annually with interest and principal due no later than 10 years from the date of purchase. Under the terms of the $670,000 Jerden note, payments during the first 3 years were payable solely out of 50 percent of net income from the master recording. Beginning on the third anniversary of the note, October 26, 1984, annual payments of $1,600 were required. Petitioners paid the $16,000 cash down payment by check dated October 26, 1981. The $16,000 recourse promissory note was paid by petitioners on November 8, 1982, along with interest of $1,941.04. The purchase agreement between Jerden and petitioner provided as follows: WHEREAS, [Jerden] owns all rights including all rights in and to the respective artists' contracts hereinafter conveyed to Purchaser, * * * free and clear of all liens and encumbrances, in and to certain master sound recordings, * * * to be used in the manufacture of phonograph record albums *296 and pre-recorded tapes * * * for all purposes whatsoever and in perpetuity throughout the whole world; * * * * * * NOW, THEREFORE, the parties hereto agree as follows: 1. Sale of the Master Sound Recordings. [Jerden] hereby sells, grants, bargains * * * and forever conveys to the Purchaser * * * all of [Jerden's] right, title, privilege, interest, ownership, and claims of any kind and character whatsoever which it now has * * * in the master sound recording. This sale includes without limitation the following rights: (a) The master sound recording and wherever and whenever permitted, the exclusive right to secure copyright registration of the "Sound Recordings" in Purchaser's own name and the right to renew such copyrights * * * with respect to the Master Sound Recording. * * * 2. Seller's Warranties and Representations. [Jerden] hereby warrants, represents, and covenants with respect to each master sound recording and each album as follows: * * * (b) [Jerden] has the sole, full and exclusive right, title, and interest in and to the master sound recording and the unrestricted power to enter into and perform this Agreement. The purchase agreement *297 and most other documents executed by petitioner with respect to his purchase of a master recording identified his master recording only as "Master #8674 B. J. Thomas." Petitioner also executed a security agreement by which petitioner granted Jerden a security interest in the master recording. Jerden never perfected its security interest in the master recording. Petitioner also received a bill of sale covering his master recording. Petitioner also received from Dennon a copy of an appraisal report signed by Robert Dombrowski, which states that the fair market value of a master recording identified only as "B. J. Thomas" was $702,000. These and other documents petitioner received with respect to his master recording investment fail to include the songs included on the master, their composer, the length of play, nor do they mention Ray Stevens. Petitioner was promised, but never received, a second appraisal. Simultaneous with the execution of the purchase agreement, petitioner entered into a sales agency agreement with First American. Under this agreement First American agreed to market records produced from petitioner's master recording. Petitioner was required to provide the funds *298 necessary for the production of the first 1,000 records; thereafter, First American would advance these costs on behalf of petitioner. First American also agreed to guarantee sales of 2,000 albums per year during the second through the eighth year of the sales agency agreement, regardless of actual sales. Guaranteed sales, such as contemplated by the First American agreement, are not common features of distribution agreements in the record industry. According to the promotional materials petitioner reviewed prior to purchasing his master recording, these "guaranteed" sales would generate sufficient income to enable petitioner to pay the debt service on the $670,000 Jerden note. As compensation for its efforts, First American was to receive 50 percent of total net revenues from the sale of records produced from petitioner's master recording. First American was a corporation organized under the laws of the State of Washington. Dennon owned all the stock of First American and served as a director and president at the time petitioner purchased his master recording and entered into the sales agency agreement with First American. First American marketed records under several labels, *299 First American, Music is Medicine, Piccadilly, The Great Northwest Music Company, Stoney Plain, Burdette, and Jazz Man. The First American record catalog consisted primarily of previously released material. For example, the Jazz Man series consists mainly of re-releases of early recordings of several well known jazz musicians and which generated consistent if not spectacular sales. First American also provided local Seattle artists the opportunity to produce and distribute records made from master recordings of their music. A business plan prepared by First American and mailed to petitioner on April 28, 1982, proposed that petitioner's master recording would be used to create one record album marketed under the Piccadilly label to be identified as "PIC 3593." Records marketed under the Piccadilly label were designed to sell for a retail price of $5.98 and a wholesale price of $2.69. As promised, on the date petitioner purchased his master recording he received an advance loan commitment from LaSalle Overseas Bank, Ltd. (LOB). The Jerden promotional materials provided that if the purchaser of a Jerden master recording paid the loan commitment fees, "LaSalle will refinance the *300 debt for a further 10 years, stamp the Jerden note paid, and cancel the security agreement, at which time the master becomes the 'free and clear' property of the purchaser." Under the loan commitment, LOB agreed to lend to petitioner $1,883,436.70, which was designed to be sufficient to repay the $670,000 recourse note to Jerden plus accrued interest at maturity. In order to secure this advance loan commitment, petitioner agreed to pay to LOB an initial loan commitment fee of 1 percent of the committed loan amount or $18,834, one-half of which was payable upon the execution of the loan commitment and one-half 1 year later. Thereafter, petitioner was required to pay an annual loan commitment fee of one-half of 1 percent of the loan amount until the time the loan was funded. The loan from LOB was to be unsecured. The terms of the LOB loan required that it was to be repaid in 10 annual installments the first of which was to be paid 1 year after the loan was funded. The first 9 installments were to equal one percent of the principal amount of the loan and applied first to accrued interest and then to principal. The remaining principal balance and accrued interest on the note was *301 due on the tenth anniversary of the loan. The LOB loan commitment also gave petitioner an unusual payment option. On the due date of the first installment petitioner could choose to make that and all future installments in U.S. currency or the U.S. currency equivalent of a mix of two foreign currencies chosen by petitioner from lists supplied by LOB. If petitioner chose to tie installments to the mix of foreign currency, the exchange rates for the first and all future installments would be determined by the exchange rates on the date of the first installment. Petitioner could choose to tie the annual installments to different pairs of foreign currency during each year of the term of the loan. It was anticipated that petitioner would elect to use this "basket of currencies" payment option. As a result petitioner would be able to make each installment in U.S. dollars based upon the exchange rates of the pair of foreign currencies that had experienced the greatest loss of value vis-a-vis the U.S. dollar. The payment option virtually assured that petitioner could satisfy the note at a fraction of its face value. The promotional materials provided to petitioner described the *302 "basket of currency" option to retire the debt incurred in the purchase of a master recording with a purchase price of $351,000 in this manner: On the date of refinancing, La Salle agrees that 120 foreign currencies, as defined in the advance loan commitment, are "pegged" to the U.S. Dollar. In other words, $100,000 U.S. is equal to the equivalent amount of all other currencies whether they be stated in Pounds, Piastres, Pesos, Cruzeiros, etc. La Salle agrees that the purchaser may irrevocably elect at the time of first payment to pay off the refinanced debt in either U.S. Dollars or a combination of two other foreign currencies in any year. Assuming that the foreign currency method is elected for paying off the note, 50% of the $7,642 annual debt service must be paid off out of the 60 currencies grouped in Basket "A" and the other 50% from the other 60 currencies grouped in Basket "B". Between 1969 and 1979, the International Monetary Fund Yearbook of 1980 shows how foreign currencies fared against the U.S. Dollar. By reference to the Preliminary Information document dated March 1, 1982, you will see that by using the foreign currency method, historically an expense of $22,087 *303 eliminates the original $764,245 refinanced amount, plus $1,005,316 interest accrued from the 10th through the 20th year for a total of $1,769,561. The currencies included in the "basket of currency" option are as follows: (I) the basket "A" countries are as follows: Afghanistan, Algeria, Argentina, Australia, Austria, Bahamas, Bahrain, Bangladesh, Barbados, Belgium, Benin, Bolivia, Botswana, Brazil, Burma, Burundi, Cameroon, Canada, Central Africa Republic, Chad, Congo, Cyprus, Denmark, Egypt, Ethiopia, Fiji, Finland, France, Gabon, Gambia, Ghana, Greece, Honduras, India, Indonesia, Iran, Iraq, Israel, Ivory Coast, Jamaica, Japan, Jordan, Kenya, Korea, Kuwait, Liberia, Libya, Madagascar, Malawi, Malaysia, Mali, Malta, Mauritania, Mexico, New Zealand, Nicaragua, Panama, Paraguay, Peru, Suriname, Trinidad and Tobago; and (II) the basket "B" countries are as follows: Chile, Colombia, Costa Rica, Dominican Republic, El Salvador, Ecuador, Germany, Grenada, Guatemala, Guyana, Haiti, Iceland, Ireland, Italy, Lebanon, Mauritius, Morocco, Nepal, Netherlands, Niger, Nigeria, Norway, Oman, Pakistan, Papua New Guinea, Philippines, Portugal, Qatar, Rwanda, Saudi Arabia, Senegal, Seychelles, *304 Sierra Leone, Singapore, Somalia, South Africa, Spain, SriLanka, Sudan, Swaziland, Sweden, Switzerland, Syrian Arab Republic, Tanzania, Thailand, Togo, Tunisia, Turkey, Uganda, United Arab Emirates, United Kingdom, Upper Volta, Uruguay, Venezuela, Western Samoa, Yugoslavia, Yeman Arab Republic, Yeman P.D. Republic, Zaire, Zambia. The following schedule showing the rapid devaluation of several unstable currencies was included in the promotional materials given to petitioner: CURRENCY SCHEDULE
1969
1970
1971
1972
1973
1974
INFLATION ADJUSTED
DOLLAR VALUE
USA $100,000
94,100
90,054
87,083
81,597
72,703
BASKET
ARGENTINA
PER US $100,000
(A)
87,500
70,000
70,000
70,000
70,000
CHILE
PER US $100,000
(B)
83,333
62,500
40,000
2,778
535
BRAZIL
PER US $100,00
(A)
87,787
77,196
69,991
69,935
58,507
COLOMBIA
PER US $100,000
(B)
93,531
85,380
78,365
72,036
62,495
ICELAND
PER US $100,000
(B)
100,000
100,777
89,989
104,881
74,346
ISRAEL
PER US $100,000
(A)
100,000
83,333
83,333
83,333
58,333
PERU
PER US $100,000
(A)
100,000
100,000
100,000
100,000
100,000
TURKEY
PER US $100,000
(B)
60,569
63,886
63,886
63,886
64,617
URUGUAY
PER US $100,000
(B)
100,000
67,567
34,153
26,680
15,096
*305 CURRENCY SCHEDULE
1969
1975
1976
1977
1978
1979
INFLATION ADJUSTED
DOLLAR VALUE
USA $100,000
66,015
62,187
58,145
53,785
47,708
BASKET
ARGENTINA
PER US $100,000
(A)
5,747
1,275
586
349
216
CHILE
PER US $100,000
(B)
117
57
35
29
25
BRAZIL
PER US $100,00
(A)
47,960
35,236
27,102
20,793
10,228
COLOMBIA
PER US $100,000
(B)
54,182
49,170
47,045
43,731
40,768
ICELAND
PER US $100,000
(B)
51,580
46,441
41,342
27,695
22,309
ISRAEL
PER US $100,000
(A)
49,295
40,000
22,742
18,401
9,900
PERU
PER US $100,000
(A)
86,000
55,787
29,682
19,726
15,472
TURKEY
PER US $100,000
(B)
59,669
54,245
46,494
35,801
25,572
URUGUAY
PER US $100,000
(B)
9,157
6,250
4,621
3,544
2,953
SOURCE: CONSUMER PRICE INDEX, EXCHANGE RATES. INTERNATIONAL FINANCIAL STATISTICS, INTERNATIONAL MONETARY FUND YEARBOOK 1980 The following presentation concerning payment of the final balloon installment under the "basket of currency" option was made to petitioner. The discussion refers to the currency schedule reproduced immediately above. Now, on the currency schedule, we're going *306 to go to year ten on the currency schedule and we're going to kind of go up and down on the schedule and you can see that some are very high and some are very low. That's the remaining value of $100,000 of all these foreign currencies. By going back to the first one, which is Argentina, you can see that Argentina's currency has declined from a value of $100,000 down to $216. That happend [sic] because in 1975, you can see Argentina began experiencing catastrophic inflation and their dollar dropped from $70,000 to $5,747 to $1,275, etc. until it got to a total of $216. Chile, in Basket B, was worth $25.00 at that point because back here in 1972, Allende got in as a dictator and absolutely debauched the currency of Chile during that period of time and dropped it almost to being valueless - only being worth $25. So, naturally, we're going to be using Argentina Pesos to make 50% of our debt service and Chilean Pesos to make the other 50% of our debt service. Now, let's see the impact of that on the other schedule. Now, don't forget, we have to pay out a $1,700,783 in debt service here in the twentieth year. Let's see how much it costs us. Going back to the actual debt service, *307 we can see in Argentinian Pesos, we have to pay $1,837 U.S. to come up with enough Argentine Pesos to pay off $850,000 worth of debt service. In the next column, Chile's even better. In Chilean Pesos, all we have to come up with is $212 U.S. to pay off the other $850,000 worth of debt service required under the note so the total U.S. dollars required is $2,049 to retire $1,700,000. * * * LOB was incorporated on April 1, 1980, under the laws of the Colony of Montserrat, British West Indies, which allowed LOB to carry on banking business in currencies other than East Caribean dollars outside Montserrat. On April 4, 1980, Johnston and Goodwin purchased 100 percent of the stock of LOB. At all times relevant hereto, Johnston and Goodwin exercised complete dominion and control over LOB for their sole, joint personal benefit. LOB maintained a single checking account at Seattle First National Bank (Seafirst no. 84-21703). The major sources of deposits into Seafirst no. 84-21703 were loan commitment fees from purchasers of Jerden master recordings, purchases of LOB stock (mainly by entities also under the control of Johnston and Goodwin), and interest on term deposits. These deposits *308 were almost entirely offset by withdrawals from Seafirst no. 84-21703 payable directly to Johnston and Goodwin or to nominee entities. LOB never held itself out to the general public as a banking institution nor transacted banking business with the general public. On May 29, 1981, Jerden and LOB executed a partnership agreement whereby Jerden agreed to contribute the long-term notes executed by petitioner and other purchasers of Jerden master recordings for a 50 percent partnership interest. In return for the remaining 50 percent partnership interest LOB agreed to contribute voting preferred stock. The ostensible purpose of the partnership, called Record Collections Company, was to collect the 50 percent share of net income received from the sale of records by First American payable under the Jerden notes. It was anticipated that, upon the maturity of the Jerden notes, Record Collections Company would be dissolved. Upon dissolution LOB would receive the Jerden notes and security agreements and Jerden would receive the LOB preferred stock. A total of 102 Jerden notes executed by petitioner and other investors were assigned to Record Collections Company on the date they were *309 executed. Record Collections Company was dissolved on December 30, 1982. The partnership never collected any monies due under the Jerden notes. Despite the purported assignment of the Jerden notes to Record Collections Company, Jerden personnel still treated the notes as assets of Jerden. Sometime prior to October 15, 1982, Dennis Herbert, vice president of Jerden, attempted to pledge these notes as collateral for a bank loan. The notes were refused as collateral. After the purchase of the master recording, First American began sending petitioner bi-quarterly statements reporting the sales performance of PIC 3593. No sales were reported through the second calendar quarter of 1982. Beginning with the sales report for the third and fourth calendar quarters First American reported sales of $2,690. This corresponds to the sale of 1,000 copies of PIC 3593 at a wholesale price of $2.69 each. In fact, no sales occurred and the reports merely reflected the accrual of the "guaranteed sales" assured in the sales agency agreement. Petitioners received no cash from these guaranteed sales. When petitioner inquired about why PIC 3593 had not been marketed, he was informed that the market *310 was not right for release and that First American was poised to release PIC 3593 in the first or second quarter of 1982. Petitioner continued to meet with or telephone Dennon, Johnston, and Goodwin to discuss the failure of First American to produce and market PIC 3593. Petitioner received a copy of his master recording no earlier than February 1982. This copy was a cassette tape recording without any special packaging and included a B. J. Thomas recording of "Suspicious Minds" with a gap of silence. Petitioners received from First American copies of purchase orders dated October 30, 1981, and issued for the production of 5,000 records made from petitioner's master recording. These purchase orders are fictitious. The vendors to whom they were issued had no records that they had received these purchase orders although they had done business with First American on other matters. No steps were actually taken by First American to prepare petitioner's master for duplication and marketing until August 1982 at the earliest. In December 1982, Dennon sold Jerden to Pathe Discos, Ltd., and appears to have resigned as president and director. Pathe Discos, Ltd., became a United Kingdom *311 corporation on May 1, 1981. Prior to that time Pathe Discos, Ltd., had no separate legal existence. Dennon arranged for the incorporation of Pathe Discos, Ltd., through attorneys in Seattle and London. Pathe Discos, Ltd., was to be owned by a Danish shell company owned by a business associates of Dennon's, David Hubert. At all times relevant to this case, Pathe Discos, Ltd., has been under the direct control of Dennon. In January 1983, Dennon sold First American to Dennis Herbert and resigned as its president. Herbert, who had been vice president of Jerden and First American, became president of First American. In March 1983, Herbert informed petitioner that First American planned to release PIC 3593 in October or November 1983. First American budgeted $300 for the costs to produce and market PIC 3593. Petitioners never advanced to First American funds sufficient to pay for the production of the first 1,000 copies of PIC 3593 as required under the sales agency agreement. In November 1983, petitioner's master recording or a copy thereof was forwarded to Tono Tapes in Chicago for duplication. However, no more than three copies exist. No copies have been placed for sale to *312 the public and no royalties have been paid by petitioner, First American or Jerden with respect to the material on PIC 3593. On May 9, 1984, First American filed for bankruptcy. Following the demise of First American, petitioner made no independent efforts to promote or market his master recording. The few copies of PIC 3593 that were produced are in tape cassette format. These cassettes, bearing the Red Carpet label, are entitled "Side by Side." The tapes contained all the material from the copy petitioner had received earlier except that the song "Suspicious Minds" with the gap of silence had been deleted. Petitioner did not authorize, nor was he aware of the deletion of any songs. The insert containing label information included no special artwork pertaining to the artists or their songs. The Red Carpet label denoted a corporation partly owned by Herbert, which was ostensibly engaged by First American to market PIC 3593. In response to the bankruptcy of First American, I.R.S. investigations of Dennon, and I.R.S. audits of returns filed by master recording investors, Johnston and Goodwin created Master Owners Protective Association, Inc. (MOPA). The main function of MOPA *313 was to act as nominee for investors in master recordings sold by Jerden and others who wished to purchase and sell master recordings as part of a pooling arrangement. In a letter dated September 12, 1984, an officer of MOPA explained the benefits of participation in MOPA as follows: If you are successful in negotiating such a bona fide sale of your master and if you also happen to be under audit by the IRS (assuming that you haven't already settled), we believe that you might very well have established the groundwork for winning your audit. Even if you have settled with the IRS, there are still the obvious financial benefits resulting from such a sale of your master. Petitioner purchased an ownership interest in MOPA for $702, which amount was calculated based upon a percentage of the purchase price paid for petitioner's master recording. As part of MOPA petitioner also contributed $1,000 to a joint venture ostensibly designed to sell, in bulk, the master recordings purchased by petitioner and others from Jerden. Organizational documents of the joint venture provided: IT IS THEREFORE AGREED: 1. The COMMON VENTURERS will transfer by their signatures hereto, their right, *314 title and interest to their listed Master Recordings to MOPA, INC. as NOMINEE and receive therefor * * * an undivided fractional interest in the total holding of Master Records in the proportion that their respective stipulated asset value bears to the aggregate of such value. 2. MOPA, INC. will use its best efforts to sell, trade, exchange or pool on a wholesale level, preferably in bulk, the entire inventory of Master Records for cash, terms or combinations thereof. On December 13, 1984, an action was filed in the name of the United States seeking a permanent injunction against MOPA, Johnston, Goodwin, and others under section 7408. [5] In its complaint filed with the U.S. District Court for the Western District of Washington, the United States alleged as follows: 22. The scheme involved calls for the Purchasing Pool to "purchase," from the Selling Pool, the master recordings the investors have contributed to it at a price equal to or greater than that originally "paid" by the investors to Jerden. * * * 23. The foregoing transactions are accomplished by MOPA as agent for both of the Pools. In sum, under the scheme presently being promoted by the defendants, investors *315 are to do nothing more than "sell" their interests in their master recordings to themselves, and to utilize sham transactions to justify claiming tax benefits. Without admitting or denying the allegations in the district court complaint, MOPA, Johnston, and Goodwin consented to an injunction prohibiting further promotion of MOPA and its attendant components. Final judgments of permanent injunction were issued by the district court in September 1986. *316 Prior to October 1981, B. J. Thomas was a well known male pop vocalist. He is best known for the song entitled "Raindrops Keep Falling On My Head," which was one of the most successful recordings of late 1969 and early 1970 and which held the number one position on Billboard Magazine's "Hot 100" singles chart for four consecutive weeks. In addition to this "signature" song, B. J. Thomas had a string of pop singles hits between 1966 and 1978. B. J. Thomas received three "Gold Records" for sales of "singles." A "Gold Record" is awarded for "singles" that sell in excess of 1,000,000 copies based upon certification from the Recording Industry Association of America. A "single" is a double-sided phonographic disc with one song per side. B. J. Thomas' singles generally enjoyed greater sales success than albums of his recordings. He has had only one album that was certified as a "Gold Record." The success of this album is attributable to the fact that it includes "Raindrops Keep Falling On My Head." An album is eligible to be certified "gold" if more than 500,000 copies are sold. None of his other albums ever reached a position higher than number 50 on the Billboard Magazine popular *317 album charts. By 1980, B. J. Thomas had switched to recording gospel music; he later turned to a country music repertoire. Petitioner previewed a copy of his master recording that included the following songs recorded by B. J. Thomas: "Suspicious Minds" "Happier Than The Morning Sun" "Sweet Cherry Wine" "It's Only Love" "I (Just) Don't Know Any Better" The five B. J. Thomas selections that were originally part of the master recording purchased by petitioner were recorded for Scepter Records and released between 1966 and 1972. Only two of these songs were ever listed on Billboard Magazine's "Hot 100" singles; "Happier Than the Morning Sun" held position number 100 for two weeks in 1972 and "It's Only Love" reached position number 45 in 1969. Two other songs were never released as singles and appeared only on albums; these songs were not hits. A fifth song, "Suspicious Minds," a remake of Elvis Presley's 1969 number one hit was not a hit for B. J. Thomas. Scepter Records declared bankruptcy in the mid-1970's. As a result, the B. J. Thomas catalog of master recordings were acquired by Springboard Records. The B. J. Thomas/Scepter Records recordings were subsequently *318 licensed to several companies. Between 1975 and 1985 over a dozen different record companies acquired non-exclusive licenses to the B. J. Thomas/Scepter Records recordings and marketed the recordings, almost all at budget or near-closeout prices. As a result, in 1981 there was very little retail acceptance of B. J. Thomas' recordings other than his current gospel material. Everest Records Group, Inc., acquired from Springboard a license in the foreign rights to the B. J. Thomas selections that are included in petitioner's master recording. By agreement dated May 12, 1980, Everest Records Group, Inc., sublicensed the five B. J. Thomas selections to Pathe Discos, Ltd. This sublicense was non-exclusive and was for a term of 5 years. The "Licensed Territory" was limited to the United States and Canada even though Everest Records Group, Inc., represented in the preamble to this agreement that it held only the foreign rights to these materials. As consideration for the sublicense, Pathe Discos, Ltd., as lessee, agreed to pay Everest 10 percent of the suggested retail price for 100 percent of all net sales of all records manufactured and sold by the lessee. An advance minimum royalty *319 of $500 was paid in cash to Everest. No royalties have been paid under this sublicense except for the $500 advance royalty. No mechanical royalties have been paid with respect to these materials. Everest also sublicensed the same B. J. Thomas materials to other entities. Everest did not have adequate title to license the rights to market the B. J. Thomas materials in the United States. By agreement dated March 10, 1981, Pathe Discos, Ltd., as "Producer," assigned the worldwide rights in certain material identified only as "B. J. Thomas" to Jerden. By the same agreement, Jerden agreed to pay Pathe Discos, Ltd., an amount totaling $390,000. On the same date, Jerden issued a promissory note to Pathe Discos, Ltd., in the amount of $380,000 with the $10,000 balance ostensibly paid in cash. Other documentation suggested that Pathe Discos, Ltd., had incurred recording costs of $390,000 with respect to a master recording identified only as "B. J. Thomas." Recording costs for the B. J. Thomas materials acquired by petitioner were not incurred by Pathe Discos, Ltd., but had been incurred by Scepter Records prior to the initial release of the B. J. Thomas materials. Springboard subsequently *320 declared bankruptcy. Following the bankruptcy, CBS, Inc., acquired the entire right, title, and interest in and to each master recording owned by Springboard subject to the licenses to Everest Records Group, Inc., and others. Pursuant to the wishes of CBS, Inc., Everest canceled the sublicense of all materials to Pathe Discos, Ltd. Prior to October 1981, Ray Stevens was a well known male pop vocalist. Ray Stevens had 27 pop single chart records between 1961 and 1979. He is mainly known for his novelty songs such as "Ahab, The Arab," "Gitarzan," and "The Streak," which held the number one position on Billboard Magazine's "Hot 100" singles chart for 3 weeks in 1974. Ray Stevens' "Everything Is Beautiful" also reached Billboard's number one singles position in 1970. Like B. J. Thomas, Ray Stevens enjoyed more sales success with single recordings than with albums. Ray Stevens failed to receive a "Gold Record" for any of his nine albums released prior to October 1981. None of his albums has ever reached a position higher than number 35 on Billboard Magazine's pop album charts. Since 1980 Ray Stevens has changed to a country and western repertoire. The Ray Stevens materials purportedly *321 acquired by petitioner constituted five selections from one side of his album entitled "Nashville," which was first released and distributed in 1973. The "Nashville" album enjoyed mediocre success although the title song "Nashville," which was not included in the materials acquired by petitioner, did reach position number 37 on Billboard Magazine's country chart in 1973. Following the success of "The Streak," the "Nashville" album was re-released, but it still failed to sell well. The titles of the songs included in petitioner's master recording were as follows: "Love Me Longer" "Float" "Golden Age" "Never Ending Song of Love" "Nobody's Fool" None of the songs were hit singles for Ray Stevens. In 1981, the materials could only be expected to be marketed at budget prices. The Ray Stevens materials purportedly acquired by petitioner were recorded by Stevens on the Barnaby Records label. Rights in the Ray Stevens/Barnaby materials were licensed to MGM who first released and distributed them in 1973. Subsequently, Barnaby licensed these materials to GRT. In July 1979, GRT filed for bankruptcy and Barnaby, through its licensing agent, attempted to secure licenses *322 for the entire Barnaby Records catalog of recordings as a package deal. When that effort failed, Barnaby began licensing the individual master recordings in a piecemeal fashion. In 1980, RCA obtained from Barnaby Records an exclusive license to certain Ray Stevens material, which constituted his "greatest hits," for a $25,000 advance royalty. In July 1980, a collection of Ray Stevens' non-hits, including those acquired by petitioner, were licensed by Barnaby to First American. The Ray Stevens materials were licensed to First American on an exclusive basis for 3 years for an advance royalty of $500 per album. No other royalties have been paid under this license, nor have any mechanical royalties been paid. The Ray Stevens materials were not sold or licensed to Jerden by First American. Considered separately, the value of the B. J. Thomas and Ray Stevens materials in question did not exceed $500 each. The coupling of the B. J. Thomas and Ray Stevens material into a single master would not enhance the value of the materials. Petitioner could expect only insubstantial sales of PIC 3593 even at budget prices. Jerden also did not have sufficient title to transfer ownership of the *323 B. J. Thomas and Ray Stevens materials to petitioner. The fair market value of the rights acquired by petitioners in the B. J. Thomas/Ray Stevens master recording did not exceed $1,000. Up to the time of trial, petitioner had made actual cash payments with respect to his master recording totaling $73,855.04 as follows: 1981
1982
1983
1984
Down payment to Jerden
$16,000.00
Short-term note to Jerden
$17,941.04
Loan Commitment fee to LOB
15,285.00
15,285.00
$7,642.00
MOPA
$1,702.00
$31,285.00
$33,226.04
$7,642.00
$1,702.00
The LOB loan commitment agreement provided that payment of the annual loan commitment fee was a condition upon the continuing liability of LOB to refinance the Jerden note. Nevertheless, petitioner made no more payments under the LOB loan commitment after 1983. Although an installment was due no later than October 26, 1984, petitioner failed to make this or any other payments under the $670,000 Jerden note. On June 11, 1981, petitioner drew a check on petitioners' joint bank account in the amount of $5,000 payable to a friend. The check included the notation "Loan." No loan documents were prepared with *324 respect to this advance. Petitioner did not require a specific time for repayment of the advance or require the payment of interest. The advance has not been repaid. The friend was a former client of petitioner in his commodities futures brokerage business. Petitioner had earned substantial commissions from the trades he executed on behalf of his friend. The friend had both enjoyed successes and sustained losses in commodity futures trading. At the time of the $5,000 advance by petitioner, the friend, who was approximately 66 years old, no longer traded commodity futures and was unemployed. The $5,000 advance was used to cover losses incurred in trading commodity futures and to pay personal living expenses. At the time he made the advance, petitioner had no reasonable expectation that it would be repaid. On their joint Federal income tax returns for the taxable years 1981 and 1982, petitioners claimed deductions with respect to petitioner's investment in the Jerden master recording shelter as follows: 1981
1982
Depreciation
$105,350
$154,440
Loan Commitment fees
15,285
15,285
In addition, for the taxable year 1981 petitioners claimed an *325 investment tax credit in the amount of $70,200 with respect to the investment by petitioner in the Jerden master recording. The unused portion of this credit was carried back to petitioners' tax liability for the taxable years 1978, 1979, and 1980. By a notice of deficiency mailed June 12, 1984, the Commissioner disallowed deductions for depreciation and loan commitment fees and investment tax credit claimed by petitioners with respect to the investment in the Jerden master recording. The Commissioner also imposed the addition to tax for valuation overstatements under section 6659. By amended answer respondent seeks the higher rate of interest provided in section 6621(c)(1) based upon the allegation that there is a substantial underpayment of tax attributable to tax motivated transactions as defined in section 6621(c)(3)(A)(i) and (ii). By amended petition petitioners claim a business bad debt deduction under section 166 in the amount of $5,000 because they allege that the advance made to Robert Thomas on June 11, 1981, was worthless on December 31, 1981. OPINION Issue 1. Deduction of Depreciation, Loan Commitment Fees, and Entitlement to Investment Tax Credit
Petitioners *326 claimed depreciation deductions and investment tax credit with respect to the investment in a master recording. In his notice of deficiency the Commissioner disallowed the deductions claimed for depreciation and loan commitment fees and the investment tax credit in their entirety. Respondent asserts several grounds as the basis for disallowing the claimed depreciation deductions and investment tax credit. Entitlement to the claimed deductions and credit hinges on a showing by petitioners that their activities with respect to the master recording either constituted a trade or business or were undertaken and carried on for the production of income. Beck v. Commissioner,85 T.C. 557, 569 (1985), and cases cited therein. Petitioners bear the burden of proving that the determinations of the Commissioner are incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). We harbor no reluctance to state our conclusion initially; petitioners cannot enjoy the tax benefits purportedly available to investors in the Jerden master recording tax shelter. In most respects the facts of the instant case are similar to those in the many tax shelter cases wherein *327 we have disallowed tax benefits claimed upon the purchase of assets such as master sound recordings, books, films, and lithographic materials. See, e.g., Flowers v. Commissioner,80 T.C. 914 (1983); Beck v. Commissioner,supra;Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Harrington v. Commissioner,T.C. Memo 1984-428, affd. without published opinion 774 F.2d 1151 (3d Cir. 1985). The question remains, however, as to the appropriate legal analysis upon which to base our conclusion in this case. Upon due consideration we conclude that the unified analysis set forth recently by this Court in Rose v. Commissioner,88 T.C. 386 (1987), for application to "generic tax shelters," is appropriate here. Common characteristics of such shelters include the following: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question *328 consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * * [Rose v. Commissioner,88 T.C. 386, 412 (1987).] Although there are myriad variations, the foregoing factors are generally present in many tax shelter arrangements. The Rose analysis seeks to synthesize various theories upon which we have previously evaluated whether an investment was made primarily or solely for tax benefits and, accordingly, whether those tax benefits should be denied. Rose v. Commissioner,supra at 407-415. Analyzing the instant case under the unified approach of Rose means that we need not consider separately the many alternative and overlapping attacks made by the Commissioner upon the deductions and credits claimed by petitioners. Rose v. Commissioner,supra at 407. In this regard *329 Rose requires that we look to objective indications of whether the taxpayer entered into a transaction lacking economic substance. A. The Dealings between Petitioner and Jerden, First American, et al.
We are convinced that petitioner, a successful businessman, purchased a Jerden master recording solely in an effort to generate deductions and credits to offset substantial income earned from other sources. A review of his approach to the purchase of a master recording for a price of $702,000 confirms his disregard for an economic profit from his investment. The promotional materials petitioner received from Johnston and Goodwin focused almost exclusively on tax benefits. Cf. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 93 (4th Cir. 1985), affg. in part, revg. in part, and remanding 81 T.C. 184 (1983). At no time did petitioner seek the advice of someone familiar with the music or record industry about the merits of purchasing a master recording; he did, however, consult with his accountant, Gervais, concerning the purported tax benefits. Petitioner selected his master recording based solely on the advice of Dennon and his own *330 subjective and uneducated music judgment. Petitioner never sought an independent appraisal of his master recording. Petitioner received a projection that he could earn a profit of $1,929,400 on the sale of one million records, or $1.93 per record. He never attempted to confirm the correctness of the projection of costs or that one million records could be sold. In fact, we are convinced that he gave this projection only cursory review. At trial petitioner repeatedly asserted that, on the basis of the representations made by Dennon, Johnston, and Goodwin, he would earn a profit of only $574,000 on the sale of one million records; this was actually the hypothetical profit to the artist, not to the master owner. Nevertheless, petitioner agreed to a purchase price of $702,000 without any negotiation. We may safely conclude that petitioner agreed to the $702,000 purchase price, rather than one of the lesser prices offered by Jerden because this price best met his tax planning goals. [6]
*331 The record reveals that Jerden possessed at most a non-exclusive license in the B. J. Thomas/Ray Stevens materials; Jerden could not convey title in these materials to petitioner. It is clear, however, that petitioner was completely unconcerned with whatever legal rights he might have obtained. Petitioner never inquired as to Jerden's ownership of the B. J. Thomas/Ray Stevens materials nor sought a legal opinion concerning title to those materials. Prior to purchasing a master recording, petitioner had only heard an inferior, nonprofessional recording made from his master recording. Petitioner never received a copy of his master recording until more than a year after the purported purchase; this copy, in tape cassette format, included a song sung by B. J. Thomas with an unexplained gap of silence. We are also convinced that petitioner's minimal efforts to produce and distribute records or tapes made from his master recording are merely window dressing aimed at securing the desired tax benefits. Petitioner agreed to purchase his master recording from Jerden and, simultaneously, entered into a sales agency agreement with another Dennon-controlled entity, First American. This *332 sales agency agreement provided that First American would receive as compensation for its efforts, 50 percent of total net revenues. No steps were taken by First American to prepare petitioner's master recording for distribution until August 1982 at the earliest, and First American never distributed copies of petitioner's master recording prior to filing for bankruptcy in May 1984. Petitioners failed to introduce any evidence as to how many copies of PIC 3593 were produced. The record reveals that only three copies exist. Petitioners did not advance any funds to First American to pay for the production of the first 1,000 copies of PIC 3593. We take this as an indication that they did not intend to produce marketable quantities of PIC 3593. We acknowledge that First American actually conducted a record business to some extent. First American sold records, most of which were re-releases of readily obtained material, under some of its labels. First American also provided the opportunity for local Seattle talent to distribute their music. However, to the consternation of some of the artists who entered into distribution agreements with First American, it appears that First American *333 made no real effort to market their music. In any event, "the mere presence of a valid business enterprise at some levels of a transaction does not automatically entitle passive investors distant from day-to-day operations of the enterprise to the associated tax benefits." Beck v. Commissioner,supra at 380. Petitioner responded to the failure of First American to take any meaningful action with respect to his master recording with no more than intermittent inquiries and complaints. Petitioner made no independent efforts to arrange for the distribution of records or tapes made from his master recording. Petitioner did, however, invest in MOPA, which was simply another effort, engineered by the promoters of the Jerden master recording shelter, to clothe petitioner's master recording investment with legitimacy. As the record shows, MOPA was organized to conceal the true nature of the Jerden master recording investment primarily by finding a "buyer" for petitioner's master recording. We have considered and rejected the claim that petitioner's genuine efforts to generate sales from his master recording were thwarted by the I.R.S. Petitioners have failed to show any causal *334 connection between the actions of the I.R.S. including audits of investor returns and an investigation of Dennon, and the failure of First American to take any meaningful steps towards distribution of petitioner's master recording. The I.R.S. investigations certainly did not stop petitioner from taking independent action to distribute his master recording. Instead he engaged in further window dressing by way of MOPA. The order of permanent injunction against Johnston, Goodwin, and MOPA did not prevent petitioner from seeking alternative ways to distribute his master recording. B. Relationship Between Purchase Price and Fair Market Value
Petitioner agreed to pay $702,000 for rights in master recordings by B. J. Thomas and Ray Stevens with a value of no more than $1,000. Petitioner received an appraisal report signed by Robert Dombrowski indicating that a master recording identified only as B. J. Thomas had a fair market value of $702,000. Petitioner never received a second appraisal promised by Jerden. Dombrowski testified that this "appraisal" was a projection of potential gross revenues over a 7-year period, not an appraisal of fair market value. He assumed that records *335 would be sold at $7.98 even though he acknowledged that the B. J. Thomas materials had been previously released. He did not recall considering the value of any Ray Stevens materials. His projection did not consider costs of production or marketing or royalties nor did he discount the projected revenues to present value. Dombrowski testified that he was not qualified to appraise master recordings at the time he signed his "appraisal." We give no credence to the Dombrowski opinion. Petitioners offered the opinion of Morton Craft in an effort to demonstrate the value of their master recording. Craft is undoubtedly knowledgeable about the music and record industry in general. Nevertheless, his opinion that the fair market value of petitioner's master recording was $350,000 had no basis in fact. Craft's valuation of $350,000 was based upon an estimated profit of $1 per record or tape for sales of 35,000 units for ten years. Craft valued the master recording based solely upon his subjective determination of the name value of the artists. He did not consider the particular songs on the master recording nor did he even listen to the master recording prior to making his valuation. *336 He candidly admitted that he had no basis for selecting a figure of 35,000 for projected annual sales. [7] It is also apparent that Craft was estimating potential net revenues, not fair market value. He assumed a profit of $1 per record or tape regardless of the method of distribution. He did not take into account petitioner's sales agency agreement with First American. His projection was not for the 10-year period beginning in 1981, but could be for any such period. He was not familiar with the term "discounted to present value." Suffice it to say that his opinion is not probative of the value of the rights acquired by petitioner. *337 In contrast, we find the valuations given by respondent's experts, Thomas Bonetti and John F. Wedeman, to be more believable. Both had extensive experience evaluating master recordings for purchase and license. Although respondent's experts considered the name recognition of the artists, they focused primarily on the individual recordings. All of the songs on petitioner's master recording had been previously released and had enjoyed limited or no success. In the case of the B. J. Thomas materials, they were available at budget prices from a variety of sources following the bankruptcy of Scepter Records. As a result there was very little retail demand for additional re-releases of B. J. Thomas pop recordings. Combining the songs of B. J. Thomas and Ray Stevens did not increase the value of the master recording. B. J. Thomas had ceased recording pop music and had switched to a gospel and, later, country repertoire at the time petitioner purchased the master recording. Ray Stevens had also moved to a country repertoire by 1981. Even if B. J. Thomas or Ray Stevens enjoyed renewed popularity with their current material, such success could not be expected to increase the demand for *338 their old pop recordings, save perhaps for a collection of their hits which petitioner's master recording was most assuredly not. Petitioner could not expect to make significant sales, even at budget prices, regardless of any marketing efforts he might make. Moreover, it is apparent that there exist significant title defects and that petitioner likely acquired at most a nonexclusive license to these master recordings. Bonetti and Wedeman placed a maximum fair market value upon the rights petitioner acquired in the combined B. J. Thomas/Ray Stevens master recording of $1,500 and $1,000, respectively. Had petitioner made even minimal independent investigation of the representations made by Dennon, Johnston, and Goodwin, he would have discovered a great disparity between the price he agreed to pay for his master recording and its true fair market value. Petitioner received, but misread, a projection that showed he would earn a profit of $1,929,400 or $1.93 per record, from the sale of one million records. Even if the figure of $1.93 per record were correct, petitioner would have to sell over 360,000 records made from his master recording to recoup his $702,000 purchase price. However, *339 petitioner had, or easily could have acquired, other information to show that this projection was greatly exaggerated. The projection ignores the 50 percent share of net profits payable to First American under the sales agency agreement executed by petitioner on the date he purchased his master recording. It also overestimates gross revenues in light of the proposal in the First American business plan that records and tapes made from petitioner's master recording would sell at a wholesale price of only $2.69. Errors are also apparent from a review of the projection. The estimate of producing the master recording, $100,000, was excluded because it would be charged back to the artist against royalties and it was also excluded from the total artist royalties. Respondent's expert, Wedeman, pointed out other errors regarding the rates for mechanical royalties and royalties to the AFM special funds. When these errors are corrected, and the sales agency agreement is considered the projection shows that petitioner could expect a profit of no more than $219,319 or $ .219 per record on the sale of one million records as follows: Gross Income
1 million albums sold at
$2.69 wholesale and listed at
$5.98 retail
$2,690,000 Expenses
Artists' royalties 12% of retail
sales ($5,980,000 X .12) without
reduction for production costs
$717,600
Mechanical royalties
$ .04 per song X 10 songs
X 1 million albums sold
400,000
Manufacturing, packaging, shipping
1 million albums at $ .50
500,000
Promotion, tour support
200,000
Royalties to two AFM special funds
1.5% X (75% of $2,690,000)
30,262
Administrative overhead
15% of gross income
403,500
(2,251,362)
438,638 Less 50% to First American
219,319 Net Profit to Petitioner
$219,319 $94,319 / 1,000,000 = $ .219 per record
*340 Based upon the foregoing, petitioner would have to sell an astronomical 3.2 million copies of his master recording to recoup the $702,000 purchase price. Sales of one million or even 360,000 copies are equally fantastic. Petitioner could not have purchased the master recording with the belief that its value corresponded even remotely to the $702,000 purchase price; he must have been interested in the purported tax benefits such an investment promised. Through 1982, petitioners paid a total of $64,511.04 cash with regard to their master recording investment. However, on their 1981 tax return, due April 15, 1982, they claimed investment tax credit of $70,200, plus deductions for depreciation and loan commitment fees totalling $120,285. "It defies reason to suggest that the amounts paid by petitioners are indicative of fair market value of [their master recording] without regard to the anticipated tax benefits." Rose v. Commissioner,supra at 419. C. Structure of the Financing
The presence of deferred debt that is in substance or in fact not likely to be paid is an indication of lack of economic substance or an exaggeration thereof. Knetsch v. United States,364 U.S. 361 (1960); *341 Rose v. Commissioner,supra at 419; Waddell v. Commissioner,86 T.C. 848 (1986); Estate of Baron v. Commissioner,supra. We will examine the substance, not the form, of such debt. Waddell v. Commissioner,supra at 902, and cases cited therein. In the instant case petitioner executed a 10-year recourse note in the amount of $670,000, representing the bulk of the purchase price for the master recording. On the same day, he entered into an arrangement with an organization controlled by the Jerden promoters to refinance this obligation for an additional 10 years. We view these two documents together as the method by which petitioner financed the bulk of the purchase price for his master recording. We are convinced that the long-term obligations would not be paid and that such payment was never intended. See Professional Services v. Commissioner,79 T.C. 888, 915-916 (1982); Delta Plastics Corp. v. Commissioner,54 T.C. 1287, 1291 (1970). Even if the Jerden note were refinanced by LOB, and the LOB loan were repaid according to its terms, the present value of the payments *342 that actually would be made over the 20-year terms of the two notes is so small as to make the entire financing arrangement illusory. We point out initially that petitioner had not made any payments on the Jerden note up to the time of trial. The note required payments payable out of 50 percent of net income from the sale of records. No payments have been made as there have been no sales. Petitioner also failed to make minimum annual payments of $1,600 that became due on October 26, 1984, and October 26, 1985. Petitioner was never notified that he was in default on this note nor were any collection actions undertaken. Jerden never perfected its security interest in the master recording. More significant, and certainly more intriguing, than petitioner's failure to make any payments under the long-term note, was the advance loan commitment obtained from LOB. This advance loan commitment allowed petitioners to refinance the unpaid principal and accrued interest on the Jerden note for 10 more years when it became due in 1991. The LOB loan would require minimal annual installments with the balance due in 2001. Petitioner could choose, however, to make each annual installment *343 and the final balloon payment in the U.S. dollar equivalent of two foreign currencies chosen by petitioner. Petitioner could choose to satisfy each installment with different pairs of currency. Most importantly, the exchange rates for the first and all future installments were fixed on the first anniversary of the LOB loan. The lists of foreign currencies from which petitioner could chose included many underdeveloped or Third World countries whose currencies had experienced rapid devaluations. In the presentation made to petitioner, Johnston and Goodwin demonstrated how petitioner could make each installment under the LOB loan by selecting the currencies that had experienced the greatest devaluation. Moreover, the installments due for the first 9 years of the LOB loan were equal to only 1 percent of the refinanced amount. As a result additional accrued interest was added to the balloon payment due in the tenth year. This allowed petitioner to pay off the entire refinanced amount plus substantial additional accrued interest with the pair of currencies that had experienced the greatest depreciation vis-a-vis the U.S. dollar for a 9-year period. Based upon the purchase of a master *344 recording for $351,000, the balloon payment due in the twentieth year under the LOB refinancing loan would exceed $1,700,000. In the example used in the promotional materials, under the "basket of currency" option, the $1,700,000 obligation could be "satisfied" with Argentinian and Chilean currency costing only $2,049. Although we are in no position to predict future currency exchange rates, no expertise is necessary to recognize that the probability that petitioner would have to pay off the LOB loan with actual cash payments remotely approximating the full face value is exceedingly small. It was apparent that this "basket of currency" option was designed so that petitioner could satisfy an enormous debt with minimal cash outlay because of the anticipated devaluation of the foreign currencies relative to the U.S. dollar. It was anticipated that petitioner would recognize significant taxable currency gain because of the expected devaluation of the foreign currencies; however, that gain would be more than offset by the large interest deductions claimed on the LOB loan. The absurdity of the "basket of currency" option is apparent when viewed from LOB's perspective. We have considered *345 whether a rational lender would consent to such an arrangement and concluded that, indeed, it would not. LOB allegedly committed itself to make a loan, which, at the option of the borrower, could be repaid in any unstable currencies of his choosing. The only way LOB could fail to lose money on this arrangement is if every foreign currency in the two "baskets" did not lose value relative to the U.S. dollar during the 10-year term of the note. The only way they could profit from this arrangement would be if every foreign currency appreciated relative to the U.S. dollar. When Johnston was asked how LOB would profit from this arrangement he responded as follows: The bank intends to make a profit by hedging that paper which it holds against hard currencies in the foreign countries, similar to that which a currency or paper speculator in this country might do if he's holding long-term. We think such a scheme would do no more than possibly reduce LOB's currency losses, and not generate a profit. LOB never took any steps to implement such a plan. Petitioner stopped making the annual loan commitment fees when the availability of the tax benefits became doubtful because of an *346 I.R.S. audit. [8] However, LOB never cancelled the loan commitment. We find LOB to be primarily a device whereby Johnston and Goodwin, the designers and promoters of the Jerden master recording program could receive most of their share of investors' cash payments by way of the alleged loan commitment fees. They also received a sizeable direct commission on each sale *347 of a master recording. Because the loan commitment fees received by LOB were diverted to the personal use of Johnston and Goodwin, the bank never had the resources to fund any substantial loans. Upon refinancing the long-term notes, Jerden's security interest in the various master recordings was canceled. This makes it more doubtful that the long-term notes would be paid. The alleged partnership between Jerden and LOB, Record Collections Company, was a further effort to make this transaction appear legitimate. Jerden assigned the long-term notes received from petitioner and other investors to the partnership. By design, the partnership was to dissolve with the Jerden notes going to LOB. The partnership gave the appearance that LOB could satisfy all the Jerden long-term notes. It is apparent from the attempt by Herbert to pledge those notes on behalf of Jerden that LOB never had control of the notes. The method used to finance the bloated purchase price of the master recording is strong evidence that the entire transaction lacked economic substance. The LOB loan commitment itself had no economic substance and was designed to give the Jerden long-term notes the appearance of *348 legitimacy as well as generate additional tax benefits to petitioner. The LOB loan was a tax shelter within a tax shelter. D. Perceived Congressional Intent
Like the taxpayers in Rose v. Commissioner,supra at 421, petitioners here claim that they are merely taking advantage of Congressionally enacted tax incentives. We are not convinced that the master recording investment in question is the type of transaction that Congress desired to encourage. Based upon the nature of the dealings between the parties, the disparity between the purchase price and the fair market value of the property acquired by petitioners, and the illusory nature of the financing of the transaction, we are convinced that petitioners' acquisition of a master recording from Jerden is devoid of economic substance. Therefore, the transaction does not support the claimed deductions for depreciation and loan commitment fees or investment tax credit. Issue 2. Theft Loss Deduction under Section 165
As an alternative argument, petitioners contend that if we disallow the deductions and credit they claimed with respect to their investment in a Jerden master recording, they are then *349 entitled to a deduction under section 165(c)(3) for a theft loss to the extent of their cash investment. Section 165 generally allows a taxpayer to deduct, in the year the theft is discovered, uninsured losses arising from the theft of property. Sec. 165(a), (c)(3), (e). Whether a theft loss has been sustained within the meaning of section 165 depends upon state law. Luman v. Commissioner,79 T.C. 846, 860 (1982), and cases cited therein. The exact nature of a theft, whether it be larceny, embezzlement, obtaining money by false pretenses, or other wrongful deprivation of property of another, is of little importance provided it constitutes theft. West v. Commissioner,88 T.C. 152, 162 (1987). Petitioners claim that Jerden breached the warranties of title in the purchase agreement and allege that Dennon, Johnston, and Goodwin, made misrepresentations as to the value and ownership of the master recording. However, our holding that petitioner's investment in the Jerden master recording lacked economic substance includes a finding that petitioner was motivated to enter the transaction to obtain the purported tax benefits. Therefore, petitioner *350 was not purchasing a master recording, but rather a tax shelter. Petitioners have made no efforts to demonstrate that the investment in the Jerden master recording shelter was induced in a manner unlawful under the laws of State of Washington. Further, petitioners have not demonstrated that the promoters knew that the purported tax benefits were not available. Cf. Krahmer v. United States,810 F.2d 1145 (Fed. Cir. 1987). Both petitioner and the promoters knew that the master recording shelter was subject to challenge by the Commissioner on several fronts. The 25-page tax opinion prepared by Joseph Wetzel at the promoters' behest, and which was given to petitioner, outlined the various attacks that the Commissioner would likely make. Therefore, to be more precise, petitioner was not purchasing a tax shelter for which the tax benefits were guaranteed, but rather a tax shelter that petitioner should have known would be subject to challenge by the Commissioner. In this case petitioner appears to have received exactly what he paid for. See West v. Commissioner,supra at 163-164; Luman v. Commissioner,supra.
Because theft *351 losses are deductible under section 165(c)(3) only to the extent they are not compensated by insurance or otherwise, petitioners must have no reasonable recourse or prospect of recovery before they may claim a deduction. Ramsay Scarlet and Co. v. Commissioner,61 T.C. 795, 807 (1974), affd. 521 F.2d 786 (4th Cir. 1975); see also Dawn v. Commissioner,675 F.2d 1077 (9th Cir. 1982), affg. per curiam an unpublished order of this Court. Even if we were to assume that petitioners otherwise sustained a theft loss, they have not submitted evidence sufficient to show that they are unable to recoup their alleged theft loss. Moreover, petitioners have not demonstrated that they discovered the loss in one of the taxable years before us. Sec. 165(e). We point out that petitioners paid the LOB advance loan commitment fee for 1983; such an action is inconsistent with the claim that they discovered that they were defrauded in a prior year. See West v. Commissioner,supra at 164. Issue 3. Addition to Tax Under Section 6659
Section 6659 imposes a graduated addition to tax whenever an individual, closely held corporation, *352 or personal service corporation has a substantial underpayment of tax (equal to or exceeding $1,000) attributable to a valuation overstatement. A valuation overstatement has occurred "If the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Sec. 6659(c). If the valuation claimed exceeds 250 percent of the correct valuation the addition is equal to 30 percent of the underpayment, but only to the extent attributable to the valuation overstatement. Petitioners claimed an adjusted basis of $702,000 for their master recording. Because we have found that the transaction is devoid of economic substance and is to be disregarded for tax purposes, petitioners have no adjusted basis for purposes of depreciation or investment tax credit. Therefore, the correct adjusted basis for the master recording is zero. See Rose v. Commissioner,supra at 426; Zirker v. Commissioner,87 T.C. 970 (1986). Accordingly, the addition to tax, calculated at 30 percent, is clearly applicable to the extent that *353 the underpayment was generated by depreciation deductions and investment tax credits to which petitioners are not entitled. Zirker v. Commissioner,supra at 979-980. [9]
The addition to tax under section 6659 does not apply in this case to the extent the underpayments of tax are attributable to the disallowed deductions claimed for the LOB advance loan commitment. Under section 6659(c) a valuation overstatement exists where the value or adjusted basis of any property, claimed on any return, exceeds 150 percent of the correct amount. Depreciation and investment tax credits are determined with reference to a claimed adjusted basis in certain property; as a result this adjusted basis is claimed on the return. *354 The same does not hold true with respect to the deductions claimed by petitioners for the advance loan commitment. Deduction of these amounts is disallowed because they relate to a transaction without economic substance and not to an activity for which deductions are allowable under sections 162 or 212. "The portion of the deficiency attributable to these items, however, is not affected by our determination of a valuation overstatement." Rose v. Commissioner,supra at 426; see Zirker v. Commissioner,supra at 980-981. The result is no different than if the required loan commitment fees were based upon a flat fee, rather than as a percentage of the desired loan amount. We reject petitioners' claim that respondent should have waived the addition to tax under section 6659. Section 6659(e) provides for a waiver of the addition to tax upon a showing by the taxpayer "that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith." Whether to grant or deny a waiver under section 6659(e) is discretionary and is reviewable only for an abuse of discretion, such as where denial *355 of a waiver was arbitrary, capricious, or unreasonable. See Estate of Gardner v. Commissioner,82 T.C. 989 (1984); Hospital Corp. of America and Subsidiaries v. Commissioner,81 T.C. 520, 594 (1983). Petitioners have not demonstrated that respondent abused his discretion by refusing to grant a waiver under section 6659(e). [10]
Issue 4. Additional Interest under Section 6621(c)
By an amendment to answer, respondent requests the imposition of additional interest on the entire underpayment under section 6621(c). Since this issue was raised as a new matter in his amended answer, rather than in the notice of deficiency, respondent bears the burden of proof. Rule 142(a). Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to "any substantial underpayment [exceeding $1,000] attributable to tax motivated transactions." [11] A tax motivated transaction is defined to include "any valuation overstatement (within the meaning of section 6659(c))." Sec. 6621(c)(3)(A)(i). Inasmuch as we have already determined a valuation *356 overstatement, respondent's burden of proof has been met, but only to the extent that his claim for additional interest applies to the portion of the underpayment attributable to the disallowance of depreciation and investment tax credit. However, Temporary Regulations adopted pursuant to section 6621(c)(3)(B) also include as attributable to a tax motivated transaction, "Any deduction disallowed for any period under section 183, relating to an activity engaged in by an individual or an S corporation that is not engaged in for profit." Sec. 301.6621-2T, A-4(1), Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 50392 (Dec. 28, 1984); see also sec. 301.6621-2T, A-4(2) (deduction disallowed under sec. 165(c)(2)). Faced with a similar situation in Rose v. Commissioner,supra, we stated, "The evidence is overwhelming tht the miscellaneous deductions in issue here are 'tax motivated'; and application of the Temporary Regulations to the deficiencies attributable to disallowance of these deductions is consistent with the express provisions and implicit policy of section [6621(c)]." Rose v. Commissioner,supra at 427. Therefore, respondent *357 is entitled to additional interest on the entire portion of the deficiency respecting petitioners' investment in the master recording. Issue 5. Bad Debt Deduction Under Section 166
As a final issue unrelated to the Jerden master recording shelter we must address petitioners' claim for a bad debt deduction for the taxable year 1981 in the amount of $5,000. Section 166 allows a deduction for any debt that becomes worthless within the taxable year. However, only bona fide debt qualifies for purposes of section 166. "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs. No deduction is allowed where the taxpayer has no reasonable expectation of repayment at the time the loan in made or acquired. See Arrigoni v. Commissioner,73 T.C. 792, 799 (1980); *358 Page v. Commissioner,2 B.T.A. 1316 (1925). Petitioners have not demonstrated that the loan was not worthless when made and, therefore, no deduction is allowed under section 166. Petitioners contend that the $5,000 advance became worthless between June 11, 1981, and December 31, 1981. Even if we assume the advance was worthless on December 31, 1981, petitioners have not demonstrated that this person's financial situation was such that he could be expected to repay the loan when it was made and that his situation changed for the worse during the succeeding months. On June 11, 1981, and at year end this person was unemployed and apparently no longer traded commodity futures. Although we have no doubt that substantial fortunes can be won, lost, and won again in quick succession in trading commodity futures, we have nothing but petitioner's uncorroborated speculative testimony to indicate that this person could or would return to trading commodity futures. As petitioner stated, at year end the borrower was a "hopeless wreck, physically." Petitioner did not demonstrate that the borrower was in any better condition, financial or otherwise, at the time of the advance. *359 We think that the advance may more accurately be characterized as a gift rather than a loan. The advance was made without interest was to be repaid "when he could." The monies were used, in part, to pay living expenses. The loan was not documented save for the notation "loan" on the check from petitioner. We acknowledge that petitioner earned substantial commissions in the past by executing trades on behalf of this person. However, that fact, standing alone, does not counter the other evidence that causes us to conclude that the $5,000 advance was made with the purpose of helping an old friend and business associate in financial need. We do not quarrel with such motivation, but the intent to make a gift precludes the deduction claimed for a bad debt under section 166. Other Observations Concerning Petitioner's Shelter Investment
In Elliott v. Commissioner,84 T.C. 227, 247-248 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986), we stated: In conclusion, we note that this is now the fifth case to have come before us involving taxpayers who have invested in book properties, not for any true business purpose, but for the *360 purpose of generating artificially high tax deductions through nonrecourse debt which bears no relationship to the actual fair market value of the book properties purchased. In each of these five cases, we have concluded that the taxpayers had no honest profit objective in engaging in the activity, and that the nonrecourse debt involved was not a genuine indebtedness. Thus, we have denied the claimed deductions and credits generated by the book investments. * * * * * * At some point, the arguments in these highly leveraged tax avoidance (or evasion) schemes must be regarded as "frivolous or groundless." Sec. 6673. We have now considered more than 16 cases in which taxpayers have invested in master recording schemes in which the financing was nonrecourse or, as here, illusory. [12] In one of those early cases, Snyder v. Commissioner,T.C. Memo. 1985-9, we stated: In conclusion, it is apparent from the overall record of this case that petitioner was a party to an abusive tax shelter. This type of arrangement disparages good tax planning and denigrates both the congressional purpose inherent in the credits and deductions which we here disallow and our national *361 tax system. Petitioner knew, or reasonably should have known, this when he agreed to participate in this specious stratagem of tax illusion. Petitioner, and those like him, who exchange small cash amounts for large tax deductions because of pie-in-the-sky nonrecourse transactions arranged to jack up basis without underlying economic substance or entrepreneurial risk may become subject to consequences unanticipated by the parties. See Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affg. Fox v. Commissioner,80 T.C. 972 (1983). In Grace v. Commissioner,T.C. Memo. 1986-304, we warned taxpayers in master recording shelter cases about the prospect of damages under section 6673. In Hawkins v. Commissioner,T.C. Memo. 1987-233, on our own volition, we awarded $5,000 to the United States. *362 The outstanding common element of all of these cases, regardless of the structure of the financing, is the total lack of support for the values claimed for the master recordings. In other words, the claimed values are fictitious. We have found no case in which petitioners have been able to sustain their position. We here repeat our warning that repetitious proceedings of this nature justify an award of damages under section 6673. See also Pollard v. Commissioner,816 F.2d 603 (11th Cir. 1987), affg. an unpublished order of this Court; and Brown v. Commissioner,85 T.C. 968, 1001-1004 (1985), on appeal (9th Cir., Jan. 5, 1987). Taxpayers similarly situated are thus on notice of the increasing likelihood of awards of damages in appropriate cases. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the relevant years, and all Rule references are to the Rules of Practice and Procedure of this Court.↩
2. Subsec. (d) of sec. 6621 was designated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended.↩
3. All subsequent references to petitioner in the singular refer to Melvin McCain.↩
4. Due to an arithmetic or typographical error, the projection incorrectly reflected $2,510,600 as the total for the listed expenditures. The correct total of expenditures is $2,510,000.↩
5. Sec. 7408(a) provides as follows: SEC. 7408. ACTION TO ENJOIN PROMOTERS OF ABUSIVE TAX SHELTERS, ETC. (a) Authority to Seek Injunction. -- A civil action in the name of the United States to enjoin any person from further engaging in conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc.) or section 6701 (relating to penalties for aiding and abetting understatement of tax liability) may be commenced at the request of the Secretary. Any action under this section shall be brought in the district court of the United States for the district in which such person resides, has his principal place of business, or has engaged in conduct subject to penalty under section 6700 or section 6701. The court may exercise its jurisdiction over such action (as provided in section 7402(a)) separate and apart from any other action brought by the United States against such person.↩
6. Petitioner testified as follows: Q. Did you review what the tax benefits might have been with respect to the acquisition of a less expensive master? A. Certainly. Q. Did your choice of a master turn on, to some extent, the tax considerations that would be available from it? A. Yes, that and the income I was having at that time, and the amount of money I had available.↩
7. Q. Why did you conservatively pick the figure of 35,000 per year? Why did you pick that figure of all figures? A. Well, I figured if I took a conservative figure, they could reach it. Q. But why not 40,000 instead of 35,000? A. Why not 60,000? Why not 200,000? Q. I'll ask the questions. A. I know. But I'm saying to you, I just picked 35,000. I didn't have any particular reason. Q. You didn't have any particular reason? A. Not to pick 35,000, or 50,000, or 40,000. I was just estimating what I thought they could sell, without knowing the people involved.↩
8. At trial petitioner explained his failure to continue the payment of the loan commitment fees: Q. Have you considered terminating your loan commitment with LaSalle Overseas Bank? A. No. I talked with them and said I was holding the payment for '84 and '85 because of the investigations in this case that we're involved in right here. They said I had up to two years to make good on those payments. * * * Q. Okay. * * * [T]o your understanding or your present thinking, will the outcome of this case be determinative as to whether you repay the [Jerden] loan? A. That would depend on how it comes out and all the other factors that come down on this. At this moment in time I am obligated for this recourse note. * * * But I certainly want a clearer picture of everything than I know at this moment.↩
9. Sec. 6659 applies for returns filed after December 31, 1981. Although petitioners filed returns for the taxable years 1978, 1979, and 1980 prior to December 31, 1981, they are liable for the additions to tax under sec. 6659 because the underpayments of tax for those years are attributable to the carryback of unused investment tax credits claimed on the return for the taxable year 1981. Nielsen v. Commissioner,87 T.C. 779↩ (1986).
10. Cf. Noonan v. Commissioner,T.C. Memo. 1986-449↩.
11. The provision is applicable to transactions entered into prior to its enactment, but the additional interest accrues only after December 31, 1984. Solowiecjczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005↩ (2d Cir. 1986).
12. Flowers v. Commissioner,80 T.C. 914 (1983); Hawkins v. Commissioner,T.C. Memo. 1987-233; Harmon v. Commissioner,T.C. Memo. 1986-305; Grace v. Commissioner, 1986-304; Seely v. Commissioner,T.C. Memo. 1986-216; Holland v. Commissioner,T.C. Memo. 1985-626, on appeal (9th Cir., July 18, 1986); Watts v. Commissioner,T.C. Memo. 1985-531; Gessler v. Commissioner,T.C. Memo. 1985-390; Looney v. Commissioner,T.C. Memo. 1985-326, affd. without published opinion 810 F.2d 205 (9th Cir. 1987); Call v. Commissioner,T.C. Memo. 1985-318; Cronin v. Commissioner,T.C. Memo. 1985-83; Snyder v. Commissioner,T.C. Memo. 1985-9; and Kovacevich v. Commissioner,T.C. Memo. 1986-513↩. The Court takes judicial notice that numerous other similar cases are at various stages of proceeding before the Court. The Court will continue to hear cases involving separate fact situations; but the taxpayers must be aware that failure to show material differences between their case and decided cases may justify the inference that, in addition to being groundless, a proceeding was instituted or maintained by the taxpayer primarily for delay. See sec. 6673.